## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

KENT KRIST,

           Plaintiff,

v.

                                      **MEMORANDUM OF LAW & ORDER**
                                      Civil File No. 14-4457 (MJD/LIB)

BNSF RAILWAY COMPANY,

           Defendant.

Michael F. Tello and Michael P. McReynolds, Tello Law Firm, and David M. Bolt and Joseph M. Sayler, Bolt Hoffer Boyd Law Firm, Counsel for Plaintiff.

Jacqueline M. Holmes, Jones Day, and Lee A. Miller and Sally J Ferguson, Arthur, Chapman, Kettering, Smetak & Pikala, PA, Counsel for Defendant.

## I.      INTRODUCTION

This matter is before the Court on the parties' cross-motions for summary judgment.  [Docket Nos. 30, 41]  The Court heard oral argument on September 28, 2016.  Because Plaintiff could not meet Defendant's medical standards for fitness for duty insofar as he could not tolerate full-time work, Defendant is entitled to summary judgment.

## II.     BACKGROUND

### A.     Factual Background

1

### 1.    The Parties and Plaintiff's Injury

Defendant is BNSF Railway Company ("BNSF").  BNSF hired Plaintiff

Kent Krist on May 3, 2004.  (Morrell Aff., Ex. D, Krist Dep. 25-26.)  Krist belonged

to the United Transportation Union ("UTU") and worked as a brakeman,

conductor, and switchman.  (Id. 26-27, 33.)

On August 3, 2006, Krist suffered a work-related back injury: a handbrake

malfunctioned and he injured his back.  (Id. 58.)  He informed his trainmaster

and filed an injury report with BNSF on August 4.  (Id. 58-59.)  Krist then went

on medical leave until December 2010.  (Morrell Aff., Ex. L, Employee Transcript

at 2.)

On April 13, 2007, orthopedic surgeon Timothy Garvey, M.D., operated on

Krist to repair a herniated disk.  (Morrell Aff., Ex. D, Krist Dep. 60-61, 93; Morrell

Aff., Ex. M, Garvey Dep. 19-20.)

After Krist's back injury, BNSF assigned a manager from its Medical &

Environmental Health Department, Connie John Swanson, to assist Krist in

returning to work.  (Morrell Aff., Ex. N, Swanson Dep. 6, 31; Morrell Aff., Ex. D,

Krist Dep. 61-62.)

### 2.     BNSF Attendance Policy

BNSF maintains an attendance policy entitled the Attendance Guidelines. (Morrell Aff., Ex. B, Murphy Dep. 11-12, 15; Morrell Aff., Ex. C, Attendance Guidelines.)  The Attendance Guidelines are BNSF's own policy, not part of a collective bargaining agreement, and they can be modified as BNSF chooses. (Morrell Aff., Ex. B, Murphy Dep. 15-16.)

The Attendance Guidelines state that TYE (train, yard, and engine) employees and Yardmasters must be "'full-time' employees."  (Attendance Guidelines at 1.)  BNSF considers full-time service an essential function of all operating employees; Krist was hired as a TYE employee.  (Morrell Aff., Ex. A, Morgan Dep. 8, 84-86.)  Under the Guidelines, full-time service is defined by a maximum per-month threshold of absences for each position.  For an employee, such as Krist, who worked a five-day assigned service (five scheduled work days and two scheduled rest days per week), the threshold is one any day absence per month, in addition to rest days and other excluded time.  (Attendance Guidelines at 1; Morrell Aff., Ex. B, Murphy Dep. 78; Morrell Aff., Ex. E, Brown Dep. 42-43, 120.)  Excluded time includes absences for jury duty, union business, National Guard service, vacation, paid personal leave, and medical leave.  (Attendance Guidelines at 1.)

3

When employees are absent, they use a three-letter "layoff" code to label the reason for their absence.  (Id.; Morrell Aff., Ex. F, Layoff Codes.)  Layoff codes include "FML," for Family Medical Leave Act; "ION" for Injury On Duty; "LOP" for Layoff Personal Business; "LOS" for Layoff Sick; "MED" for Medical Layoff; and "VAC" for Layoff Vacation, among others.  (Layoff Codes at 1.)  ION is defined as follows: "All on-duty injuries must be reported immediately and, as a result, use of this code must be approved by a supervisor.  This would also include re-occurring incidents where the injury requires additional time off."  (Id. at 2.)  While LOS counts as an absence, ION does not count as an absence.  (Id. at 2, 4.)

BNSF analyzes compliance with the Guidelines on a rolling three-month basis in order "to better accommodate periods of intermittent illness."  (Attendance Guidelines at 1.)  BNSF does not consider an employee to violate the Guidelines until his total absences in a three-month period exceed the combined three-month threshold.  (Morrell Aff., Ex. B, Murphy Dep. 53, 75.)  BNSF does not discipline an employee twice for the same absence.  (Id. 84-85.)

The first violation of the Attendance Guidelines results in a formal reprimand.  (Attendance Guidelines at 2.)  The second violation results in a 10-

4

day suspension.  (Id.)  The third violation results in a 20-day suspension.  (Id.)
The fourth violation may result in dismissal.  (Id.)  The Guidelines instruct that
managers should not enforce them in a "rigid or 'wooden' manner, and in every
case should use 'common sense.'"  (Id.)

The collective bargaining agreements provide the procedures for charging
and disciplining employees for attendance violations.  (Morrell Aff., Ex. H,
Albanese Dep. 30; Morrell Aff., Ex. I, Uniform Investigation Rule.)  If a BNSF
officer believes that an employee has violated the Guidelines, BNSF issues a
notice of investigation scheduling a formal investigation.  (Uniform Investigation
Rule at 1.)  The formal investigation is an adversarial process with the burden of
proof on BNSF, which must provide a "fair and impartial" hearing before
imposing any discipline.  (Id. at 1-2.)  A BNSF officer serves as the conducting
officer.  The employee has the right to cross examine witnesses, call his own
witnesses, and introduce evidence.  (Id. at 3.)  The employee has a right to a
representative.  (Id.)  After the investigation, BNSF officers review the transcript
and determine whether the charges were proven.  (Id.; Morrell Aff., Ex. J,
Hunkus Dep. 66.)  BNSF officers inform the employee of the results in writing.
(Uniform Investigation Rule at 3-4.)  Any assessment of discipline must be

rendered within 15 days of the conclusion of the hearing.  (Uniform Investigation Rule at 3.)

If the employee faces dismissal, the case is separately reviewed under BNSF's Policy for Employee Performance Accountability ("PEPA").  (Murphy Dep. 112; Morrell Aff., Ex. G, Bausell Dep. 35-36; Morrell Aff., Ex. K, Wright Dep. 118.)  After BNSF imposes discipline, the employee may appeal, culminating in arbitration before a neutral Public Law Board ("PLB") established under the federal Railway Labor Act.  (Murphy Dep. 115-16.)

### 3.   Light-Duty Position

During the fall and winter of 2010, Krist used his seniority to begin training for sedentary work as a switch tender and hump tower operator. (Morrell Aff., Ex. Q; Morrell Aff., Ex. D, Krist Dep. 90; Morrell Aff., Ex. N, Swanson Dep. 95-96.)  As part of the return-to-work process, on November 22, 2010, Krist and his union representative, Jeremy Brown, met with Swanson, BNSF managers, and possibly, supervisor, Robert Skuza.  (Morrell Aff., Ex. D, Krist Dep. 83-85; Ex. N, Swanson Dep. 100-01; Supp. Morrell Aff., Ex. I, Skuza Dep. 19; Tello Aff., Ex. 3, Brown Dep. 48-49.)  The purpose of the meeting was for Swanson to go over Krist's restrictions, accommodation needs, and job duties.

(Id.)  At the meeting, the participants reviewed Krist's physical restrictions and medications and discussed a training schedule for his new positions.  (Id.)

Krist and Brown assert that, during the meeting, Krist told Swanson that he would not be able to work five consecutive days because he would have flare-ups of his back pain and would need to lay off work when the flare-ups occurred.  (Tello Aff., Ex. 3, Brown Dep. 41, 44, 49-53, 127-28; Tello Aff., Ex. 4, Krist Dep. 83-84.)  According to Krist and Brown, Swanson stated that taking time off from work "wouldn't be a problem."  (Morrell Aff., Ex. D, Krist Dep. 83-84; see also Brown Dep. 51.)  Brown claims that Swanson told Krist that he could take time off as needed for his back injury and that he did not need to worry about being disciplined or about the Attendance Guidelines because the absences were for a work-related injury.  (Brown Dep. 51.)  Brown claims that Skuza did not raise any concern about Krist intermittently missing work.  (Id. 134.)

Swanson testified that she had no memory of Krist mentioning that he would need to lay off intermittently for flare-ups, and Skuza testified that Krist did not mention such a need.  (Supp. Morrell Aff., Ex. D, Swanson Dep. 99-100; Supp. Morrell Aff., Ex. I, Skuza Dep. 19-20.)  Krist testified that, as far as he

knew, BNSF only has full-time employees and that he had been told by Swanson

that BNSF did not have part-time employees.  (Morrell Aff., Ex. D, Krist Dep. 28.)

### 4.    Return to Work

Krist returned to work at BNSF in December 2010.  (Morrell Aff., Ex. R,

Fitness for Duty Recommendation; Krist Transcript.)  Within a few weeks of

Krist's return, and although he used morphine while on duty, Krist suffered a

flare-up of back pain and had to go to the hospital.  (Morrell Aff., Ex. D, Krist

Dep. 87, 91; Morrell Aff., Ex. S, Medical Notes.)  Krist began another medical

leave in January 2011.  (Krist Transcript at 2.)

### 5.    2011 Operation

On March 9, 2011, Garvey performed a second back surgery on Krist.

(Morrell Aff., Ex. M, Garvey Dep. 19; Morrell Aff., Ex. D, Krist Dep. 93; Morrell

Aff., Ex. T, June 2, 2011 Garvey Note.)  Garvey released Krist for full-time duty

three months later, stating that his progress was "excellent" and that he was

"capable of returning to light duty employment at the present time full time."

(Morrell Aff., Ex. D, Krist Dep. 95; Morrell Aff., Ex. T, June 2, 2011 Garvey Note.)

Krist returned to work for BNSF in June 2011.  (Morrell Aff., Ex. L, Krist

Transcript at 2.)

On July 18, 2011, Krist visited the emergency room due to back pain and then returned to medical leave.  (Morrell Aff., Ex. D, Krist Dep. 96; Krist Transcript at 2; Morrell Aff., Ex. U, ER Letter.)

In August 2011, Garvey wrote a letter stating that Krist could work four to six hours per day or possibly every other day.  (Morrell Aff., Ex. V at 3; Morrell Aff., Ex. X, Aug. 22, 2011 Garvey letter.)  Krist informed Swanson of Garvey's opinion, and Swanson encouraged Krist to undergo additional treatment so that he could return to work on a full-time basis.  (Morrell Aff., Ex. V at 3; Morrell Aff., Ex. N, Swanson Dep. 106.)  Swanson further explained that, under Krist's current hours restrictions, BNSF would not permit him to return to work.  (Id.)  Krist relayed to Garvey that BNSF would not allow part-time employment.  (Morrell Aff., Ex. Y.)

### 6.    January 2012 Return to Work

In November 2011, Garvey released Krist to full-time work.  (Morrell Aff., Ex. Z; Morrell Aff., Ex. AA.)  Krist returned to work in January 2012, but after a few weeks, Krist took medical leave.  (Krist Transcript at 2.)  During a January 26, 2012, exam, Garvey told Krist to "'push through' his reactivation back at work" and explained that "it is highly unlikely that he would have caused any

structural change."  (Morrell Aff., Exs. BB-CC; Morrell Aff., Ex. M, Garvey Dep.

52-53.)  Garvey again released Krist to "full-time" work, defined as 40 hours per

week.  (<u>Id.</u>; Garvey Dep. 39-40, 48, 53-54.)  Krist returned to work full-time at

BNSF in February 2012.  (Krist Transcript at 2; Morrell Aff., Ex. D, Krist Dep.

132.)

Garvey saw Krist on March 5, 2012, and opined that Krist was "making

good progress."  (Morrell Aff., Ex. DD.)  Garvey noted that Krist was working

"fulltime.  (<u>Id.</u>)  Garvey instructed Krist to "[c]ontinue your walking program,"

but did not mention flare-ups or the need to miss work one to three days per

week.  (<u>Id.</u>)  He gave no treatment instructions other than to continue walking.

(<u>Id.</u>)  Garvey scheduled Krist for a one-year follow-up (<u>id.</u>), but Garvey did not

see Krist again until June 22, 2015 (Morrell Aff., Ex. M, Garvey Dep. 57).  Garvey

did not treat Krist during that three-year period.  (<u>Id.</u> 22.)  Garvey testified that,

as of March 2012, Krist had reached "maximum medical improvement," meaning

that his back condition was "as good as" it was "going to get."  (Morrell Aff., Ex.

M, Garvey Dep. 40, 112.)

### 7.    Federal Employers Liability Act Trial

In 2007, Krist had filed a lawsuit against BNSF in Anoka County Court asserting a violation of the Federal Employers Liability Act ("FELA").

On April 11, 2012, Garvey gave a deposition in Krist's FELA case.  (Morrell Aff., Ex. II, Garvey FELA Dep.)  Garvey was asked if Krist was "more at risk for having these kind of flare-ups in the future than an average individual," and he testified: "Versus somebody who has not had surgical intervention I believe, yes, sir."  (Garvey FELA Dep. 36.)  When asked if Krist would "have back flare-ups in the course of his life," Garvey testified: "Yes, sir.  Yeah, he'll have an increased risk of flare-ups versus the population at large."  (Id.)  He also agreed that "those flare-ups could cause him to have to miss work for periods of time."  (Id.)

Garvey's deposition testimony was presented during the trial, and, according to Krist, multiple BNSF managers were present to hear Garvey's testimony.  (Morrell Aff., Ex. HH at 47.)  On June 26, 2012, the parties settled and stipulated to dismissal of the FELA lawsuit, which the state court granted on July 2, 2012.  (Tello Aff., Ex. 5, Stipulation for Dismissal.)

### 8. First Investigation

Krist returned to work full time in February 2012.  During this time period, Krist worked a 5-day assigned service (Morrell Aff., Ex. E, Brown Dep. 120), which permitted him 3 "any day" absences for each rolling 3-month review period.  (Morrell Aff., Ex. D, Krist Dep. 44.)  From March 1, 2012, through May 31, 2012, Krist was absent 7 days for LOP (Layoff Personal Business) or LOS (Layoff Sick), which counted towards his 3-absence threshold.  (Morrell Aff., Ex. EE.)  From June through August 2012, he was absent 5 days for LOS.  (Id.)  Although Krist's absences exceeded the Attendance Guidelines limit, BNSF declined to discipline Krist and implemented coaching and counseling.  (Morrell Aff., Ex. H, Albanese Dep. 41-42, 116-17.)

During the three-month period from July through September 2012, Krist incurred 10 LOS absences.  (Morrell Aff., Ex. FF.)

On September 14, 2012, Krist began medical care with Ross Chambers, M.D.  (Supp. Morrell Aff., Ex. O, Chambers Dep. 35.)  During that appointment, Chambers gave Krist "routine instructions that we give patients for acute worsening of lumbar back pain:":

> For acute pain, rest, intermittent application of heat (do not sleep on heating pad), analgesics and muscle relaxants are recommended. Discussed longer term treatment plan of prn NSAID's and discussed

> a home back care exercise program with flexion exercise routine.
> Proper lifting with avoidance of heavy lifting discussed. Consider
> Physical Therapy and XRay studies if not improving. Call or return
> to clinic prn if these symptoms worsen or fail to improve as
> anticipated.

(Id. 36; Morrel Aff., Ex. KK.) Chambers testified that nothing in the instructions

authorized Krist to miss work and that the reference to "rest" did not

contemplate that Krist would be missing work. (Supp. Morrell Aff., Ex. O,

Chambers Dep. 38 ("That was not my intent.").) If Chambers had intended for

Krist to miss work, he "would have written a separate note that asked for him to

be off work or some restrictions in his work." (Id.; see also id. 45-46.) Chambers

did not prescribe Krist any narcotic medication. (Id. 39.)

On October 10, 2012, BNSF issued a notice of investigation to Krist for

failing to maintain full-time employment by incurring 10 absences in July,

August, and September 2012. (Morrell Aff., Ex. GG.)

Krist contacted Chambers and asked that he fill out FMLA paper work

before the formal investigation on November 13. (Supp. Morrell Aff., Ex. N,

Fairview Northland Record at 50.) Chambers did not have any available

appointments, so Krist "drop[ped] off the paperwork with a note explaining

what he needs." (Id. at 51.) Chambers declined to sign the materials without

seeing Krist in an appointment.  (Id. at 55; Supp. Morrell Aff., Ex. O, Chambers

Dep. 52-53.)  Chambers offered an appointment on November 26, but Krist

declined and said that "he was going to speak to his attorney to see what he

should do to get his fmla forms filled out as soon as possible."  (Fairview

Northland Record at 55.)

Krist was able to obtain an appointment with nurse practitioner Linda

Baumann on November 1, 2012.  (Fairview Northland Record at 57; Supp.

Morrell Aff., Ex. Q, Baumann Dep. 14-15.)  He told Baumann that he had been

missing one to three days of work per week and requested that she complete his

FMLA forms in order to "protect his job."  (Fairview Northland Record at 58;

Baumann Dep. 37.)  She agreed to execute the forms although she had no

previous experience with Krist.  (Supp. Morrell Aff., Ex. Q, Baumann Dep. 32;

Morrell Aff., Ex. QQ.)

The investigation was held on November 29, 2012.  (Morrell Aff., Ex. HH,

Nov. 29, 2012 Investigation Transcript.)  Brown represented Krist (Morrell Aff.,

Ex. D, Krist Dep. 34), and did not dispute that Krist exceeded his absence

threshold (Morrell Aff., Ex. HH, Nov. 29, 2012 Investigation Transcript 52-53).

Krist claimed that his absences were due to flare-ups from the 2006 back injury in

accordance with a medical treatment plan.  (Id. 51-53.)  Krist offered the

previously mentioned April 2012 deposition by Garvey from the FELA case.  (Id.

45-46.)  Brown discussed the previously quoted portion of that testimony in

which Garvey had testified that Krist's surgeries created "an increased risk of

flare-ups versus the population at large" that "could cause him to have to miss

work for periods of time."  (Id.)

        Krist also offered the previously quoted routine instructions from

Chambers, dated September 14, 2012.  (Nov. 29, 2012 Investigation Transcript 51-

52.)  He testified that if he followed his treatment plan he could not "safely

perform service" and thus would have to lay off from work.  (Id. 52.)  Krist

argued that his LOS absences were taken in accordance with Chambers'

treatment plan and, thus, were protected under the Federal Railroad Safety Act.

(Id. 51-53.)  BNSF concluded that Krist had violated its Attendance Guidelines

and, on December 7, 2012, it issued a formal reprimand.  (Morrell Aff., Ex. LL.)

### 9.    Second Investigation and First FMLA Request

        In October 2012, Krist incurred six additional LOP and LOS absences.

(Morrell Aff., Ex. MM.)

On October 8, 2012, BNSF General Manager Thomas Albanese wrote an

email to Terminal Superintendent Phillip Mullen in which he stated:

> I have a question about the Krist case.  He came back from injury a
> while ago and got a couple of free passes earlier.  When do we
> consider that over?  Seems to me he has been back over well three
> months now.  He has five days off on a threshold of two.  Is he
> missing work and claiming prior injury to mitigate his attendance?

(Tello Aff., Ex. 9.)

Albanese testified that he meant that Krist was granted no discipline

although he was over the Attendance Guidelines earlier in 2012, and he

wondered when BNSF would consider Krist capable of being a full-time

employee consistent with the Attendance Guidelines.  (Tello Aff., Ex. 8, Albanese

Dep. 41-42.)

On November 1, 2012, Krist applied for FMLA leave.  (Morrell Aff., Ex.

QQ, Nov. 1, 2012 FMLA Certification.)  He submitted the leave certification filled

out by Baumann, which stated that Krist was not unable to perform any of his

job functions due to his back injury and that the "[j]ob had been modified to

accommodate [his] condition."  (Id. at 2.)  Baumann further wrote that he would

experience episodic flare-ups once a week for one to three days per episode that

would require him to be absent from work because he would need medication

that would not allow driving and could impair his judgment.  (Id. at 3.)  On

November 7, 2012, BNSF rejected Krist's FMLA request because he was not

eligible for FMLA leave because he had not worked 1,250 hours during the

previous 12 months.  (Tello Aff., Ex. 22.)

On November 13, 2012, BNSF issued a second notice of investigation based

on Krist's failure to maintain full-time employment during August, September,

and October 2012.  (Morrell Aff., Ex. NN.)

On November 27, 2012, Mullen sent Krist a letter recommending that he

reapply for FMLA once he had built up sufficient hours to qualify, and, in the

meantime, to consider requesting a medical leave of absence or requesting an

accommodation.  (Morrell Aff., Ex. TT.)

On November 30, Krist saw Baumann again and asked her to execute a

new set of FMLA forms, which she did.  (Morrell Aff., Ex. UU.)  Baumann never

saw Krist again.  (Supp. Morrell Aff., Ex. Q, Baumann Dep. 63-64.)  She testified

that Krist was never her patient, that she did not give him a "care plan," and that

she never "treat[ed]" him.  (Baumann Dep. 17, 49, 60, 67.)

Also on November 30, Krist submitted a formal request for

accommodation to BNSF to allow layoffs when he suffered flare-ups of his back

injury.  (Morrell Aff., Ex. VV.)  The accommodation request included a form

completed by Baumann on November 30 stating that Krist required the

following accommodations: "No lifting, bending, stooping, using stairs or

ladders during acute exacerbation of pain.  May need to use narcotic pain

medication, in which instance he cannot drive or operate machinery."  (Id.)

The second investigation was held on December 3, 2012.  (Morrell Aff., Ex.

OO, Dec. 3, 2012 Investigation Transcript.)  The evidence showed that Krist

missed 6 days of work on LOP or LOS in October 2012.  (Morell Aff., Ex. MM.)

Krist asserted that his absence should be excused based on Chambers' September

14 instructions and Garvey's deposition testimony.  (Dec. 3, 2012 Investigation

Transcript 23-28, 40.)

On December 13, 2012, BNSF decided that Krist had violated the

Attendance Guidelines and issued a 10-day suspension.  (Morrell Aff., Ex. SS.)

## 10.    FMLA Leave Approval and Accommodation Denial

On December 20, 2012, BNSF approved Krist's November 30 application

for intermittent leave under the FMLA.  (Morrell Aff., Ex. WW.)

In a January 15, 2013 letter, BNSF Director of Human Resources Terry

Morgan denied Krist's request for accommodation in the form of reducing

attendance requirements to permit him to take off between 1 and 3 days per week for episodic flare-ups of back pain on the ground that it was unreasonable. (Morrell Aff., Ex. XX at 1.)  Morgan stated that "regular and reliable" attendance was an essential function of Krist's job and "vital to ensur[ing] the smooth operation of the railroad."  (Id. at 2.)  Granting the accommodation and "allowing irregular and unpredictable attendance" "would conflict with the rights of other employees and violate the Attendance Guidelines."  (Id.)  It would be "incompatible with the position [he] now hold[s] and the needs of BNSF's management to be able to schedule employees and ensure smooth operations." (Id.)

### 11.    Third Investigation

By December 20, 2012, when BNSF approved Krist's request for intermittent FMLA leave, Krist had incurred 4 additional LOS absences and 1 LOC (Layoff on Call) absence in November and December 2012.  (Morrell Aff., Ex. YY.)  On January 10, 2013, BNS issued a third notice of investigation based on failure to maintain full-time employment for the period October, November, and December 2012.  (Morrell Aff., Ex. ZZ.)  The investigation was held on January 31, 2013.  (Morrell Aff., Ex. AAA, Jan. 31, 2013 Investigation Transcript.)  The

evidence showed 5 LOS/LOC absences in November and December 2012.

(Morrell Aff., Ex. YY.)  Krist responded that his absences were protected as

following his treatment plan and pointed to the Garvey deposition, the

September 14 Chambers' document, and the November 1 FMLA certification and

November 7 denial letter.  (Jan. 31, 2013 Investigation Transcript 33-46.)

On February 12, 2013, BNSF concluded that Krist had violated the

Attendance Guidelines and issued a 20-day suspension.  (Morrell Aff., Ex. BBB.)

### 12. Federal Railroad Safety Act Administrative Complaint

On February 26, 2013, Krist filed a complaint with the Occupational Safety

and Health Administration ("OSHA") claiming that BNSF's discipline under the

Attendance Guidelines violated the Federal Railroad Safety Act because it

punished Krist for following a treatment plan for his work-related injury.

(Morrell Aff., Ex. CCC.)  Before OSHA issued a decision, Krist filed his claim in

federal court.  (Morrell Aff., Ex. EEE.)

### 13. June 2013 FMLA Certification

On June 24, 2013, Krist saw Chambers "to have BNSF specific FMLA

papers completed" because BNSF had requested a medical recertification for his

FMLA leave.  (Supp. Morrell Aff., Ex. N, Fairview Northland Record at 106;

Supp. Morrell Aff., Ex. R.)  During the June 24 appointment, Chambers did not

conduct a physical examination, but did complete the recertification form.

(Supp. Morrell Aff., Ex. O, Chambers Dep. 64-65.)

On the FMLA certification form, Chambers wrote that Krist would require

intermittent absences of 1 to 3 days once per week based on episodic flare-ups.

(Morrell Aff., Ex. NNN, June 24, 2013 FMLA Certification ¶¶ 5(d), 9(d)-(e).)

Under the section entitled "REGIMEN OF TREATMENTS," Chambers wrote that

Krist would require one treatment per month for 99 months and that the nature

of the treatments would be "physical therapy," "Celebrex, hydrocodone," and

"occasional PT as needed."  (Id. ¶ 8.)

### 14.    Termination

On August 20, 2013, Krist sent letters to his BNSF supervisors stating that

he would soon exhaust his FMLA leave, asking how he could avoid future

attendance violations, and inquiring whether he should use the ION (Injury on

Duty) layoff code, which did not count towards the absence limit.  (Morrell Aff.,

Exs. FFF-GGG.)  On September 12, 2013, Morgan wrote Krist that he could not

use the ION code and could not lay off without incurring discipline; Morgan

wrote that he should consider reapplying for FMLA once he was eligible for

another annual allotment of FMLA leave.  (Morrell Aff., Ex. HHH.)  Morgan

suggested that, in the meantime, Krist could apply for medical leave.  (Id.)

Morgan reiterated that "regular and reliable attendance is a necessary part of

your current job and is vital to ensure the smooth operation of the railroad, so

addressing attendance issues is important."  (Id.)  Krist decided against a medical

leave of absence because he would not be paid during medical leave.  (Morrell

Aff., Ex. D, Krist Dep. 167.)

After Krist exhausted his FMLA leave, he incurred absences beyond his

scheduled rest days.  In September 2013, he had 4 LOS absences, and in October

2013, he had 8 LOS absences.  (Morrell Aff., Exs. III-JJJ.)  BNSF issued two

additional notices of investigation on October 8 (for the period of July, August,

and September 2013) and November 8, 2013 (for the period of August,

September, and October 2013).  (Morrell Aff., Exs. KKK-LLL.)

BNSF held a fourth formal investigation on November 4, 2013.  (Morrell

Aff., Ex. MMM, Nov. 4, 2013 Investigation Transcript.)  Krist asserted that his

absences were due to following a treatment plan from Chambers from June 2013.

(Id. at 64-66.)  As evidence, Krist offered the FMLA certification from Chambers

from June 2013.  (Id.)  Krist asserted that following the treatment plan set forth in

Chambers' FMLA certification required him to miss work.  (Nov. 4, 2013

Investigation Transcript 65.)

BNSF held the fifth formal investigation on November 26, 2013. (Morrell

Aff., Ex. OOO, Nov. 26, 2013 Investigation Transcript.)  Krist offered an identical

defense based on Chambers' June 2013 FMLA recertification form.  (Id. 86-87.)

On December 3, 2013, BNSF notified Krist that he was eligible for FMLA

leave as of November 27, 2013, but that his leave was not yet approved because

Krist needed to "furnish a Notice of Intent to Take Paid/Unpaid FMLA Leave

medical."  (Tello Aff., Ex. 25.)

On December 4, 2013, BNSF manager David Nickles sent an email to the

PEPA board, which reviews disciplinary cases in which the employee faces

dismissal, stating:

> Please provide review of the transcript for the Aug, Sep, Oct ATG
> investigation for KA Krist, 1599117, conducted on 26 November,
> 2013.  I have attached his transcript(s) and point out that on 15
> November, he received a second 20-day record suspension for ATG
> in the previous 3-month rolling period.
>
> I have made corrections to the transcript and have sent it back this
> evening.
>
> He does not offer a new defense, and does admit that he is over his
> threshold for attendance and also to being knowledgeable on the
> policy.  He continues to rely on applying for FMLA in December,

and describes a conversation with the benefits team on the same day as the Investigation.  He again mentions his legal counsel during his testimony.

Final discipline needs to be post marked on December 10, 2013 to be within the agreement.

(Tello Aff., Ex. 26.)

BNSF decided that, in both cases, Krist had violated the Attendance Guidelines.  On November 15, 2013, BNSF issued a second 20-day record suspension for the fourth violation.  (Morrell Aff., Ex. PPP.)  Based on Krist's fifth violation, BNSF General Manager Albanese decided to dismiss Krist. (Morrell Aff., Ex. H, Albanese Dep. 8, 110; Morrell Aff., Ex. QQQ.)  BNSF's director of employee performance Kathleen Bausell and regional vice president Michael Shircliff also reviewed Krist's dismissal.  (Albanese Dep. 110-12, 118; Morrell Aff., Ex. G, Bausell Dep. 35-36, 64.)  On December 9, 2013, BNSF terminated Krist's employment "for failure to maintain full time employment in accordance with BNSF Attendance Guidelines."  (Morrell Aff., Ex. QQQ.)

The Union exhausted Krist's on-property appeals and appealed all five instances of discipline to the PLB.  (Morrell Dep., Ex. H, Albanese Dep. 87-88, 93-94; Morrell Aff., Ex. B, Murphy Dep. 116.)  The PLB upheld BNSF's discipline up to and including the termination.  (Morrell Aff., Ex. RRR.)

24

## B.      Procedural History

On October 23, 2014, Krist filed a Complaint against BNSF in this Court.

[Docket No. 1]  The Complaint seeks damages under the whistleblower

provisions of the Federal Rail Safety Act, 49 U.S.C. § 20109 ("FRSA").  In the

Complaint, Krist alleges two types of protected activity: reporting his back injury

in 2006 and following a medical treatment plan that required him to lay off

during flare-ups.  However, in briefing, Krist only asserts a claim based on the

protected activity of following a medical treatment plan.  Krist seeks damages,

expungement of all negative information from his personnel file, reinstatement,

and attorney's fees.

## III.    DISCUSSION

### A.      Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

25

fact is material if its resolution affects the outcome of the case." <u>Amini v. City of Minneapolis</u>, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 252 (1986)).

**B.      The Federal Railroad Safety Act**

Congress enacted the FRSA "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. The FRSA prohibits a railroad carrier from interfering with the treatment of an employee injured during employment: "A railroad carrier or person covered under this section may not deny, delay, or interfere with the medical or first aid treatment of an employee who is injured during the course of employment." 49 U.S.C. § 20109(c)(1). The FRSA also bars retaliation against an employee who follows a treating physician's medical treatment plan for an on-the-job injury:

> A railroad carrier or person covered under this section may not discipline, or threaten discipline to, an employee for requesting medical or first aid treatment, or for following orders or a treatment plan of a treating physician, except that a railroad carrier's refusal to permit an employee to return to work following medical treatment shall not be considered a violation of this section if the refusal is pursuant to Federal Railroad Administration medical standards for fitness of duty or, if there are no pertinent Federal Railroad Administration standards, a carrier's medical standards for fitness for duty. For purposes of this paragraph, the term "discipline" means to bring charges against a person in a disciplinary

proceeding, suspend, terminate, place on probation, or make note of
reprimand on an employee's record.

49 U.S.C. § 20109(c)(2).

Krist claims that BNSF violated subsection (c)(2) by terminating his

employment because he followed a medical treatment plan by being absent

during back pain flare-ups.

"The FRSA incorporates by reference the rules and procedures applicable

to Wendell H. Ford Aviation Investment and Reform Act for the 21st Century

("AIR–21") whistleblower cases."  Araujo v. N.J. Transit Rail Operations, Inc.,

708 F.3d 152, 157 (3d Cir. 2013) (citing 49 U.S.C. § 20109(d)(2)(A)), disagreed with

on other grounds by Kuduk v. BNSF Ry. Co., 768 F.3d 786, 790-91 (8th Cir. 2014).

Following the AIR-21 framework,

> [t]o establish a prima facie claim of retaliation under FRSA, an
> employee must show by a preponderance of the evidence that he 1)
> engaged in protected activity; 2) that the employer knew he engaged
> in protected activity; 3) he suffered an unfavorable personnel action;
> and 4) the protected activity was a contributing factor in the
> unfavorable action.

Kuduk v. BNSF Ry. Co., 980 F. Supp. 2d 1092, 1098 (D. Minn. 2013) (citing

Araujo, 708 F.3d at 157), aff'd, 768 F.3d 786 (8th Cir. 2014).  "[U]nder the [FRSA]'s

'contributing factor' causation standard, [a] prima facie case does not require that

the employee conclusively demonstrate the employer's retaliatory motive.  But

the contributing factor that an employee must prove is intentional retaliation

prompted by the employee engaging in protected activity.  Kuduk, 768 F.3d at

791 (citations omitted).

> Once the plaintiff makes a showing that the protected activity was a
> "contributing factor" to the adverse employment action, the burden
> shifts to the employer to demonstrate "by clear and convincing
> evidence, that the employer would have taken the same unfavorable
> personnel action in the absence of that behavior."

Kuduk, 980 F. Supp. 2d 1098-99 (quoting Araujo, 708 F.3d at 157).  See also 29

C.F.R. § 1982.104(e)(4).

Krist claims that he was following his doctors' treatment plan for his on-

the-job back injury when he took time off work for flare-ups.  Thus, his absences

were protected activity under subsection (c)(2) and BNSF was prohibited from

considering the absences as attendance violations and disciplining him.

### C.    Safe Harbor Provision

The Court concludes that Krist's continued employment would violate

BNSF's fitness for duty requirements; thus, Krist cannot show a violation of

subsection (c)(2).  Because the Court concludes that the safe harbor applies, the

Court need not reach the parties' dispute regarding whether a qualifying

treatment plan can exist after an employee has reached maximum recovery after

an injury.

Subsection (c)(2)'s safe harbor provision provides that

a railroad carrier's refusal to permit an employee to return to work
following medical treatment shall not be considered a violation of
this section if the refusal is pursuant to Federal Railroad
Administration medical standards for fitness of duty or, if there are
no pertinent Federal Railroad Administration standards, a carrier's
medical standards for fitness for duty.

### 1.    The Ability to Work Full-Time Is a BNSF Fitness-for-Duty Requirement

The ability to perform full-time service is one of BNSF's fitness-for-duty

standards.  All parties agree that BNSF does not permit part-time employment.

Krist testified that he knew of BNSF's policy and that he knew of no employee

who worked part-time.  BNSF clearly communicated that regular, full-time

attendance was an essential job duty, necessary for the smooth operation of the

railroad and to avoid impinging on other employees.  Cf. Nesser v. TransWorld

Airlines, Inc., 160 F.3d 442, 445 (8th Cir. 1998) ("An employee who is unable to

come to work on a regular basis [is] unable to satisfy any of the functions of the

job in question, much less the essential ones.") (addressing ADA claim) (citation

omitted); Greer v. Emerson Elec. Co., 185 F.3d 917, 921 (8th Cir. 1999) ("[R]egular

and reliable attendance is a necessary element of most jobs.") (addressing ADA claim) (quoting <u>Nesser</u>, 160 F.3d at 445).

Here, BNSF promulgated clear Attendance Guidelines with a progressive discipline policy regarding absenteeism.  The Attendance Guidelines are not vague or subject to manipulation.  Krist testified that he understood how the Guidelines applied to his position and that he knew that BNSF does not have any part-time employees.  (Morrell Aff., Ex. D, Krist Dep. 28, 43-44.)  He also knew that absences under the LOS code would count against the absence limit.  (<u>Id.</u> 44, 123, 234.)  BNSF imposed progressive discipline on Krist, a formal hearing was conducted before each discipline, and Krist admits that the absences occurred.

BNSF monitors attendance for all employees on a monthly basis and has a computerized system that calculates the attendance for each three-month period. (Morrell Aff., Ex. TTT, Dingmann Dep. 21-22; Morrell Aff., Ex. G, Bausell Dep. 77-78.)  When any employee exceeds the threshold for a three-month period, the attendance system notifies each division and local management inquires into the circumstances to decide whether to pursue a formal investigation.  (Morrell Aff., Ex. G, Bausell Dep. 77-78; Dingmann Dep. 27-28.)

BNSF regularly disciplines employees for attendance violations. Krist's union representative testified that it was "common" for BNSF to charge employees with attendance violations. (Morrell Aff., Ex. E, Brown Dep. 31.) On average, BNSF dismisses one to two employees for attendance violations per month. (Morrell Aff., Ex. H, Albanese Dep. 118-19.) BNSF points to two specific employees from the same region that it fired in 2011 and 2014 for attendance violations who did not file an injury report and had no record of medical leave. (See Morrell Aff., Exs. UUU-VVV.) Albanese testified that BNSF had never granted an employee request to reduce the attendance requirements for an individual employee, apart from accommodating qualified FMLA leave. (Morrell Aff., Ex. H, Albanese Dep. at 86-87.)

Krist asserts that Brown testified that employees were allowed to lay off because of an injury without punishment; however, Brown admitted that he had no direct knowledge of any specific case of an employee being treated more leniently than Krist. (Tello Aff., Ex. 3, Brown Dep. 110-13.) Krist also notes that retired BNSF employee George Joyce testified that, before BNSF promulgated the Attendance Guidelines, it accommodated injured workers who had flare-ups from on-duty injuries. (Tello Aff., Ex. 10, Joyce Dep. 71-72.) However, Joyce had

no direct knowledge of this practice, but simply testified that it was "common knowledge."  (Id.)  He testified that he had no particular example of an individual who had a flare-up and was excused from the Attendance Guidelines.  (Id. 88.)

In sum, BNSF has a clear attendance policy that does not permit sick leave beyond 3 days per month.  This was a legitimate fitness-for-duty standard that was an essential part of Krist's job and was necessary for smooth operation of the railroad.  The evidence in the record is that BNSF monitors all employee attendance, regularly disciplines employees for attendance violations, and that Krist understood the Guidelines and how they would be enforced against him.

## 2. Krist Could Not Meet BNSF's Full-Time Work Requirement

It is undisputed that Krist was not capable of meeting BNSF's fitness-for-duty requirement of working full-time.  Garvey released Krist for full-time duty three times (June 2011, November 2011, and January 2012).  Yet, Krist does not dispute that he could not actually work full-time when he returned to work in 2012 or any time thereafter.  Krist asserts that he is medically required to work a usual schedule of only 2 to 4 days per week, with no notice of which days those

would be.  He testified that he is not capable of working a 40-hour week.

(Morrell Aff., Ex. D, Krist Dep. 205-06, 227.)

BNSF has presented evidence that Krist's frequent, unplanned absences

negatively affected its operations, delaying freight and forcing other employees

to work beyond their shifts.  One manager testified that he had to fill Krist's

position by moving an employee from another job that then went unfilled.

(Morrell Aff., Ex. SSS, Skuza Dep. 52-55.)  This move "ultimately delay[ed] and

affect[ed] [BNSF's] ability to move the customers' freight."  (Id. 53.)  Krist's

absences caused this to occur multiple times.  (Id. 53-54.)  Other employees had

to work unexpectedly beyond their assigned shift due to Krist's sudden

absences.  (Id. 67-68.)

### 3.   Whether BNSF Knew that Krist Could Not Work Full Time When It Allowed Him to Return to Work in 2012

Krist argues that BNSF knew that he was not able to work full-time when

it returned him to service in 2012 and, thus, the full-time requirement was

waived.  He bases this conclusion on testimony that, during the November 2010

return to work meeting, BNSF was told that he would need intermittent layoffs

under his treatment plan, and that BNSF stated that there would be no adverse

33

consequences for laying off.  However, even if the November 2010 meeting

proceeded as asserted by Krist, the safe harbor provision applies.

In August 2011, when Krist was only released to part-time work (four to

six hours per day or every other day) and attempted to return to work, BNSF

informed Krist that he could not return to work with that schedule and did not

permit him to return until Garvey again released him to full-time work in

November 2011.

Krist testified that his return to work in 2012 was full-time.  (Morrell Aff.,

Ex. D, Krist Dep. 132.)  Garvey had released Krist to work full-time, defined as 40

hours per week.  These representations conflicted with Krist's later claim that he

needed to miss 1 to 3 days per week.

Krist's meeting with Swanson occurred in November 2010.  Thus, between

the Swanson meeting and Krist's final return to work in February 2012, Krist had

a second back surgery and three separate medical leaves of absence, Swanson

informed Krist that his return to work need to be full-time, BNSF rejected his

attempt to return at less than full-time, and Garvey gave three separate full-time

releases.  Moreover, there is no evidence that, during the November 2010

meeting, Krist stated how often the flare-ups would occur or how long they

would last.  The Attendance Guidelines allowed Krist to take one absence per month without penalty, in addition to FMLA, personal leave, or medical leave.

It is undisputed that, after that meeting, BNSF rejected Krist's attempt to return to work part time and did not allow his return until he was released for full-time duty.  In 2012, Garvey released Krist to work full-time, meaning 40 hours per week.  The law does not permit an employee to nullify the safe harbor by representing to the employer that he does meet the fitness-for-duty standard in order to return to work and then invoking a treatment plan if he faces discipline for failing to meet that standard.

The Court holds that BNSF has shown that the safe harbor applies and that Krist could not meet its fitness for duty requirements because he, undisputedly, could not work full-time.  Thus, BNSF was justified in terminating his employment once it became apparent that, in fact, Krist could not work full-time. BNSF is entitled to summary judgment.

Accordingly, based upon the files, records, and proceedings herein**, IT IS HEREBY ORDERED**:

1. Defendant's Motion for Summary Judgment [Docket No. 30] is **GRANTED** and this matter is **DISMISSED WITH PREJUDICE**.

2. Plaintiff's Cross-Motion for Summary Judgment [Docket No. 41] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:   March 8, 2017                    s/ Michael J. Davis
                                          Michael J. Davis
                                          United States District Court